[Civ. No. 3118. Fourth Dist. Nov. 22, 1944.]

In re ST. CLAIR ESTATE COMPANY (a Corporation), on Voluntary Dissolution. CORA M. ST. CLAIR et al., Appellants, v. ST. CLAIR ESTATE COMPANY (a Corporation) et al., Respondents.

Warren E. Libby, Burum & Shortridge and Osborn, Burum & Shortridge for Appellants.

Hanna & Morton, James M. McRoberts, Borton, Petrini, Conron & Borton and Harry M. Conron for Respondents.

BARNARD, P. J.—This is an appeal from a judgment overruling objections to, and approving and confirming, a statement of assets and an account filed in connection with the voluntary dissolution, under the supervision of the court, of a corporation.

The St. Clair Estate Company was organized as a corporation in 1903 by the St. Clair family consisting of the father, mother, three sons and one daughter. All assets then owned by the family seem to have been turned over to the corporation, of which the father was president. The father and mother died before the end of 1904, and thereafter all of the stock of the corporation, consisting of 1,200 shares, was divided between the three brothers, L. P. St. Clair, E. S. St. Clair and F. C. St. Clair, and the sister, Cora St. Clair, each owning 300 shares. The three brothers were directors of the corporation and L. P. St. Clair acted as president until 1915, when he was succeeded by E. S. St. Clair.

It rather conclusively appears from the evidence that for a number of years the affairs of the corporation were by common consent conducted in a decidedly informal manner. Few, if any, corporate records were kept and no formal meetings were held. Corporation affairs were discussed from time to time by various members of the family as they met in Bakersfield, where they all lived. Some of the monies belonging to

the corporation were deposited in two bank accounts in the name of L. P. St. Clair and these bank accounts were frequently used in carrying on the business of the corporation. It also appears that all of the stockholders, including the sister, withdrew funds from time to time from these two bank accounts and possibly from a bank account maintained by the corporation. As the trial court observed: "They had gone along as a family concern, everybody reaching in the pot, everybody taking out money, putting it in and taking it out." The evidence fully justifies the inference that this informal method of handling the corporate affairs was known to and approved by all of these stockholders for some years.

In 1913, Cora St. Clair married a man named Cooper and moved to Oakland. Very shortly thereafter dissension arose between her and her brothers, which has continued with slight, if any, interruption ever since. In fact, it may be said to have begun even prior to that time, for in 1910 she employed an attorney to examine into the manner in which the brothers were conducting the business. In 1914, she hired another attorney and after much negotiation L. P. St. Clair turned over practically everything standing in his name to the corporation and an agreement was reached in the form of a resolution adopted and approved by all of the stockholders on February 23, 1915. This stated, among other things, that no books or records of any kind had ever been kept by the corporation; that a report then made by the secretary was considered a fair, just and equitable report of all of the assets and business affairs of the corporation; that it was then agreed between all of the stockholders that this report was a full, true and correct statement of all assets and business transactions as far as could be ascertained; and that it was the intention of the corporation to open and correctly keep full and correct books and records showing all assets and transactions of the corporation.

Shortly after this 1915 settlement Mrs. Cooper pledged 240 of her 300 shares of stock to a bank in Oakland to secure a debt which she did not pay. Being advised of a proposed sale of this stock and in order to prevent it from falling into the hands of an outsider the three brothers purchased this stock at a pledgee's sale in 1915, taking it in the name of E. S. St. Clair. The other 60 shares of her stock were attached in 1917 in a suit brought by the corporation and were purchased at an execution sale in 1917 in the name of E. S. St.

Clair. While Mrs. Cooper now contends that she did not learn until January 1928 that her brothers claimed that she had no interest in the corporation it appears that in 1922 she again employed an attorney who demanded an accounting of the affairs of the corporation on the ground that she was the owner of one-fourth of this stock. He was advised in writing by E. S. St. Clair that she had no interest in the corporation and, in 1923, she testified in a debtor's examination that she was not a stockholder and L. P. St. Clair testified to the same effect.

While the three brothers seem to have taken the position that their sister was not a stockholder between 1917 and 1928 they continued to give her at least $150 a month, and larger amounts at intervals, so that she received from them during this period something over $65,000. In addition to this, the brothers, through the corporation, built a house for her use in Hollywood costing about $15,000.

In 1928, Mrs. Cooper hired another lawyer and filed an action in Kern County seeking to have it declared that one-fourth of the stock of this corporation was held in trust for her by her brothers. After negotiations extending over several months a settlement was reached early in 1929, before that action was tried. In connection with that settlement three instruments were executed. The first of these was signed by the corporation, the three brothers and Mrs. Cooper, and was acknowledged on February 2, 1929. It recites in brief that the 300 shares of stock formerly owned by Mrs. Cooper had been transferred on the books of the corporation to E. S. St. Clair; that Mrs. Cooper had filed an action claiming that these shares were held by E. S. St. Clair under an implied trust in her favor; and that E. S. St. Clair, without conceding her claim but for the purpose of compromising that action, was willing to transfer these shares to a trustee for her benefit. It was then agreed that E. S. St. Clair would immediately transfer these 300 shares to a Los Angeles bank in trust for Mrs. Cooper and after her death for her son, on terms and conditions which are set forth. It was then agreed by the three brothers, as stockholders and officials of the corporation, that insofar as they could legally do so from that day on, the "surplus profits" of the corporation should be distributed annually to the stockholders, Mrs. Cooper's share to be paid to the bank as trustee for her; that upon the sale of any assets

of the corporation the portion of the receipts representing capital, as distinguished from profit, should not be reinvested but should be distributed among the stockholders; and that in referring to "surplus profits" for the purpose of dividends only future surplus profits were contemplated. The contract then contained a provision to the effect that in order to preserve the cash on hand for the payment of dividends a right to purchase 800 shares of the common stock of the Union Oil Associates, which was owned by the corporation, would be transferred to the three brothers to enable them to exercise that right for themselves if they so desired. It was then recited that in consideration of the foregoing agreements Mrs. Cooper would immediately dismiss her pending action against the corporation and her brothers, and that "it is further understood and agreed that other than as expressed in this agreement, all claims and demands of all the parties hereto, one against the other, are hereby cancelled, annulled and abrogated."

Under date of February 2, 1929, these same parties executed a supplemental agreement referring to the agreement above described and making one or two changes therein which are not material here. In addition, this supplement contained a paragraph reading as follows:

"It is further agreed that the paragraph on Page six providing for a general release of claims is to be construed as operative only between Cora St. Clair Cooper on the one hand and L. P. St. Clair, E. S. St. Clair, F. C. St. Clair, and St. Clair Estate Company on the other hand. It is not intended to be operative among or between L. P. St. Clair, E. S. St. Clair, F. C. St. Clair and St. Clair Estate Company or either or any of them."

At the same time, a third instrument was executed by L. P. St. Clair and Mrs. Cooper. This agreement recited that whereas differences had arisen between Mrs. Cooper on the one hand and L. P. St. Clair and his two brothers on the other hand regarding the management and control of the St. Clair Estate Company, and whereas an agreement had that day been reached compromising and disposing of said differences under the terms of which it had been agreed that an annual distribution of certain surplus profits should be made, with a part payable in trust to Mrs. Cooper, and in consideration of the adjustment and compromise of the differences theretofore

existing and as an inducement to Mrs. Cooper to sign the compromise agreement L. P. St. Clair thereby guaranteed to Mrs. Cooper that such dividends for her benefit should equal $500 a month during the continued existence of the corporation; that during any month that her dividend should fall below that amount he would pay to her trustee the difference; and that during any month when any dividend exceeded $500 Mrs. Cooper would cause the excess thereof to be paid to him until such time as all advances under this guarantee had been repaid.

Following this 1929 agreement the attitude of Mrs. Cooper toward her brothers appears not to have improved. She continued as before to write letters attacking both their honesty and their management of the corporation. She complained to her brothers and others that her attorney had misled her into signing the agreement by telling her that he would break the trust as soon as she had received the benefits of the settlement. Early in 1930, she demanded of L. P. St. Clair that the trust holding the corporation stock for her be broken. When he explained to her that he had been advised by counsel that this could not be done she pulled out a gun and started for him. She was disarmed but stated "You are all milking the trust for your personal use." She made similar remarks to the other brothers and to outsiders during 1931 and 1932. In 1931, she hired another lawyer and the same year wrote to still another lawyer that she was going to sue her brothers. In 1934, she wrote to E. S. St. Clair saying that L. P. St. Clair "has told me so many lies I will never believe him any more." In 1936 or early in 1937, she pulled a loaded gun on E. S. St. Clair and the police were called in.

Immediately after the agreement of 1929 the trust with the bank in favor of Mrs. Cooper, provided for therein, was created and at all times thereafter at least $500 a month was paid to her trustee for her benefit. At times extra dividends were declared and paid to her with the result that between 1929 and the time of the hearing that resulted in this judgment a total of $92,500 was distributed to her trustee for her benefit.

On December 22, 1938, Mrs. Cooper filed a minority stockholder's suit against her three brothers, the complaint charging them with numerous acts of misconduct throughout the life of the corporation. Shortly thereafter, proceedings

were started for a voluntary dissolution of the corporation. Upon petition of Mrs. Cooper, her son and her trustee, under the provisions of section 403 of the Civil Code, the court assumed supervision over the dissolution and appointed an accountant to examine the books of the corporation and to file an account of its assets and liabilities for the period from January 31, 1929, to January 31, 1938. Later, an order was made extending the scope of the audit to cover the period from 1903 to 1938. On March 25, 1940, the auditor filed a partial report. In June, 1940, an attempt to take depositions was opposed on the ground that issues of fact had not been properly raised. (See, *St. Clair Estate Co.* v. *Superior Court,* 41 Cal.App.2d 389 [107 P.2d 45].) Thereafter, by agreement of the parties, the corporation and its directors filed a statement of its assets and liabilities with a petition for the approval of the account. Mrs. Cooper, her son and the trustee filed exceptions thereto. The corporation and its directors filed an answer to these exceptions and the matter proceeded to trial on the issues thus raised.

Depositions were taken and the trial commenced on November 13, 1941. After some days of trial a recess was taken during which the parties agreed upon certain stipulations as to many of the facts involved in the accounting, without waiving the right to rely upon the statute of limitations and laches as a bar to any of these matters. On March 2, 1942, the trial was resumed and for many days testimony was received relating to the period from 1903 to 1915. At the conclusion of that testimony the court ruled that a complete settlement of all these matters had been had by the agreement of February, 1915. On motion of the three brothers the court then heard arguments on the question as to whether or not the 1929 agreement constituted a full settlement between the parties of all matters between 1915 and 1929. After hearing the evidence offered in that connection the court held that that agreement was a complete settlement and the objectors could not question matters occurring prior to February 1, 1929. Thereafter, evidence was received as to matters occurring after that date.

The court found in favor of the brothers on practically all points in issue, finding, among other things, that all matters occurring prior to February 23, 1915, were fully compromised and settled and the claims of all parties released by the 1915

agreement; that all matters prior to January 31, 1929, were settled, compromised and disposed of by the 1929 agreement; and that Mrs. Cooper, for value, had released all her claims against her brothers or on behalf of the corporation up to that time and had estopped herself and all holding under her from further litigating any such matters. The court then found in favor of the brothers with respect to each of the exceptions which had been filed to the statement and account rendered by the directors of the corporation, except for one or two matters which were otherwise covered. It was then also found that the matters complained of, arising after the 1929 settlement, were barred by the statute of limitations and by laches. A judgment was entered approving the account as filed by the directors, with slight modifications, and overruling and disallowing the objections made thereto. From this judgment Mrs. Cooper, her son and her trustee have appealed.

The appellants make the preliminary suggestion that "because a substantial part of the record upon appeal is by deposition, written documents and stipulations of fact," this court should disregard the findings of fact made by the trial court and "must review and pass upon the entire record originally." The transcripts contain about 3,700 pages and there are many thousands of pages of documentary exhibits. While many facts were stipulated to, these stipulations relate to matters of detail and not to ultimate facts. As the trial court observed in this connection, "This is a fragmentary stipulation; it is not an agreed statement of fact." While much of the evidence was in written form, that portion not only contains innumerable conflicts but there are thousands of pages of oral testimony in the record which is strongly conflicting on most, if not all, of the issues presented. The clearest thing disclosed by an examination of the record is that the evidence in its entirety is decidedly conflicting and the usual rules apply.

The main issues raised on this appeal naturally fall into two classes, those relating to the affairs of this corporation prior to the 1929 agreement and the effect of that agreement thereon, and the matters occurring after 1929, including the effect thereon of the claimed breaches of that agreement.

With respect to the first of these classes the appellants contend that the court erred in that it failed to compel, and pass upon, a complete accounting as to all transactions of this cor-

poration between 1903 and 1929. In this connection it is argued that the agreements of 1915 and 1929 were not complete compromises and settlements as held by the trial court, but were merely "accords and satisfactions" which were of no binding effect because the respondents did not thereafter comply with their terms, respectively, and because the respondents not only continued to be guilty of fraud in handling the affairs of the corporation but by concealing their actions lulled the appellants into a sense of security and confidence.

Although the matter is relatively unimportant here, the evidence fully sustains the finding that the agreement of 1915 constituted a full settlement between the parties as to what then constituted the assets of the corporation and as to the conduct of its affairs up to that time. Mrs. Cooper herself testified that her understanding of what then occurred was that "the slate was wiped clean both ways." In this regard the appellants rely on evidence of various subsequent transactions as indicating that the 1915 agreement was not intended as a full settlement and on inferences which it is claimed might be drawn from certain later transactions from which it is claimed that it may be further inferred that certain portions of the 1915 agreement were conditions precedent which were never performed, with the result that no settlement ever took place. Assuming that any of these inferences are possible there are other possible inferences and other evidence, and the most that can be said is that a conflict appears.

The appellants attack the findings to the effect that the 1929 agreements constituted a full settlement between the parties up to that time on a number of grounds. It is first contended that the first and main one of these agreements was not intended as a settlement or to relate in any way to an accounting as to the affairs of the corporation, and that it was intended only as a settlement of the action filed by Mrs. Cooper to get back her stock in the corporation. It is argued that this contract discloses that this was its only purpose because in its preamble, after reciting that Mrs. Cooper had filed an action asserting her right to the 300 shares of stock purchased and held by E. S. St. Clair, it goes on to recite that "the said E. S. St. Clair, without conceding said claim, but for the purpose of compromising said action, is ready and willing" to return the stock to her through the trust therein provided for. While the preamble thus asserts that this one brother, for the purpose of compromising the action, was will-

ing to return the stock in this manner the contract goes on to provide that certain things are agreed upon in consideration of "the mutual concessions and agreements herein made." Many things are then agreed upon and it is then provided that in consideration of these agreements Mrs. Cooper agrees to dismiss the action which she had brought, with prejudice, and that it was further agreed "that other than as expressed in this agreement, all claims and demands of all the parties hereto, one against the other, are hereby cancelled, annulled and abrogated." In addition to the rather plain language of the instrument there is much evidence that this first contract was intended as a full settlement between the parties and that a large part of the consideration therefor was a desire to bring to an end not only the litigation which had been started by the sister, but also her many oral and written attacks upon the integrity of her brothers and upon the manner in which they had been conducting the affairs of the corporation up to that time. A large amount of evidence along this line was received and it clearly appears not only that a dispute then existed between the sister and her brothers with respect to her ownership of the stock, but also as to whether or not the corporation affairs were being honestly conducted by the brothers. In spite of certain conflicting evidence and possible inferences which the appellants are seeking to draw it must be held that the court's finding in this regard was, up to this point, sufficiently supported by the evidence.

The appellants further argue in this connection that any such effect of this first contract of 1929 is destroyed by a provision of the second or supplemental contract, which was drawn after the drafting and partial execution of the first instrument and which was executed by the parties in connection with the closing of the whole deal. While the main purpose of the supplemental contract appears to have been to increase the amount of dividends which were to be immediately declared and to accelerate the time of payment of certain future dividends to Mrs. Cooper's trustee, it was also agreed therein that the provision of the first agreement, "for a general release of claims," was to be construed as operating only between Mrs. Cooper on the one hand and her brothers and the corporation on the other hand, and was not to be operative between the three brothers and the estate company or either or any of them. There is evidence that this clause

was inserted in the supplemental agreement because it had been discovered that the original clause would have had the effect of cancelling a debt owed by the estate company to E. S. St. Clair and because a dispute then existed between E. S. St. Clair and L. P. St. Clair over another item, and it was not intended to cancel or interfere with these items. Not only did these matters not affect Mrs. Cooper's rights very directly but the clause making this change reaffirmed the release-of-claims provision in the first contract insofar as Mrs. Cooper was concerned and specified that it was to remain fully operative as between her and the other parties to both agreements. Moreover, in the third agreement executed at this time between Mrs. Cooper and L. P. St. Clair in which, in effect, he guaranteed that her dividends would amount to $500 a month, it is recited that whereas differences have arisen between Mrs. Cooper on the one hand and L. P. St. Clair and his two brothers on the other hand regarding the management of the estate company, and whereas "this day an agreement has been made and entered into compromising and disposing of said differences," and it is then provided that "in consideration of the adjustment and compromise of the differences heretofore existing," he agrees to guarantee the amount of dividends to her in the manner described. Both the instruments themselves and the evidence received in this connection support the finding that this was intended as a full settlement insofar as the rights of Mrs. Cooper were concerned up to that time, and that she thereby waived the right to question or attack any previous transactions or any prior conduct of the affairs of the corporation by her three brothers.

However, the appellants further contend that even though Mrs. Cooper thus personally made a full settlement with her brothers up to that time the effect of the supplemental agreement was to make that settlement and release of claims inoperative as between the brothers and the estate company as a corporation. It is then argued that the corporation is a separate entity, that the brothers as directors of the corporation occupied a fiduciary capacity and were under the duty of fully accounting to the corporation, that anything that is for the benefit of the corporation is also for the benefit of its stockholders, and that it follows that Mrs. Cooper as one of the stockholders was entitled in this proceeding to go into all of the affairs of the corporation and anything that had been done by its directors prior to 1929,

irrespective of her personal agreement to the contrary. It is pointed out that the trial judge, in a preliminary order for judgment in which he gave a general expression of his views on many of the matters in issue and which was later referred to and adopted as a part of the findings, used the expression that "the corporate entity may and must be disregarded." However, the judge in that document further pointed out that this was a family corporation, that its affairs were informally conducted for many years with the apparent consent of all of the stockholders, that in making the agreements of 1929 all of the stockholders had joined, that these had been made after a full and complete investigation and with the aid of counsel at all times, and that all of the stockholders had entered into the same with the idea and for the purpose of fully settling all matters as between Mrs. Cooper on the one hand and the brothers and the corporation on the other. It was then pointed out that in order to do justice in such a case some of the ordinary rules governing corporate management should not be applied and that the facts in this case compel an abandonment of the theory of corporate entity "in as far as all acts of the parties may be weighed by that standard." It is here argued that since the corporate entity cannot be entirely disregarded in such a proceeding for dissolution, the view thus expressed by the trial judge was erroneous and of itself requires a reversal.

There is a very real sense in which the corporate entity should be disregarded in this case, to a certain extent and for certain purposes, and this seems to be what the trial court had in mind in making the statement referred to. While the corporation remains as a separate entity its only stockholders were the four members of this family and the entire controversy is between the sister on the one hand and the three brothers on the other hand with respect to whether or not the brothers have properly and honestly managed her property, consisting of her interest in this corporation. Mrs. Cooper's personal interest in the only property in question and her interest in the same property as a stockholder in the corporation are, as a practical matter, identical and cannot be distinguished and separately treated without leading to an obvious injustice. It would be clearly unjust and unreasonable to hold that she was personally bound by her agreement to abide by the settlement made in 1929 but, because the cor-

poration was a separate entity, she was not bound as a stockholder, and that through that side of her dual nature she was entitled to compel an accounting with respect to prior matters in total disregard of her agreement, while still retaining the benefits she had received both personally and as a stockholder as a result of that settlement. By means of that agreement she not only got back the stock which had been lost to her through her own fault but she escaped the necessity of accounting for some $65,000 she had received between 1915 and 1929, and between 1929 and the beginning of these proceedings she received an additional $92,500 in dividends. She had agreed that all of her claims and demands against her brothers and against the corporation should be cancelled, annulled and abrogated as of 1929. As a practical matter the brothers did the same thing except that a few minor matters were left for adjustment between them. All of the stockholders having thus agreed to a settlement, at least insofar as Mrs. Cooper's rights are concerned, and the corporation having been a party to that agreement, it should not now be considered as an entirely separate entity insofar as the rights of Mrs. Cooper are concerned and merely for the purpose of permitting her to do indirectly what she could not do directly. No other rights are involved, no one else is complaining, and we think that to this extent and for the purpose of determining Mrs. Cooper's rights in this regard the corporate entity should be disregarded in the sense that it may not be relied upon for the purpose of restoring to her the rights and privileges which she has specifically waived. We find nothing in this theory of separate entity on the part of the corporation which is sufficient to overcome or upset the findings made. The corporate entity may and should be disregarded to the extent that it should not be taken as controlling in order to permit her to distinguish between her personal rights and her rights as a stockholder, and this for the express purpose of destroying and setting aside a settlement made many years ago with the only other stockholders.

It is further contended that the 1929 agreement did not constitute a full settlement up to that time for the reason that the respondents did not, in the succeeding years, comply with certain of its provisions and that while continuing to maintain full control over the affairs of the corporation they lulled the appellant into a sense of security and confidence. It is sufficient to say here that the claimed subsequent breaches

of this contract, if they occurred, did not have the effect of destroying the settlement made up to that time. Assuming that such breaches occurred they were with respect to agreements concerning the future conduct of corporate affairs, and were not as to matters which were conditions precedent to the settlement made. The claims that these agreements were not complied with and that the appellants reposed full confidence in the brothers will be later considered.

With respect to what occurred after the 1929 agreement, the appellants first contend that seven groups of findings with respect to the exceptions made to specific items of the report and account filed by the respondents are not sustained by the evidence. For the sake of reasonable brevity, it will be necessary to treat these contentions in their broader aspects without going too much into detail. The main contention in this regard is that certain purchases of Union Oil stock were made by two of the brothers personally, and that these were passed over to the corporation and treated as corporate transactions when, as it later developed, a loss was incurred. In August, 1929, the directors of the corporation authorized the purchase of 1,500 shares of Union Oil stock through a brokerage firm. Thirty thousand dollars was borrowed from a bank on an estate company note. In ordering the stock an estate company check for $30,000 was sent in a letter signed by the corporation through its president. The estate company finally paid for all of the stock and retained it and received dividends on it for years. The stock went up four points after the purchase but this was followed by the market crash of November, 1929. The appellant contends that the record shows that the brokerage firm entered this order on E. S. St. Clair's account; that the books of the corporation in connection with this transaction were not properly kept; that no entry was made on its books of any obligation to pay the balance of the purchase price to the brokerage firm; that the income tax return for the corporation for 1929 did not disclose this purchase; that certain balance sheets and statements furnished to the appellant and to her trustee did not show the purchase; that in January, 1930, certain journal entries in the corporation books were changed and then restored in February, 1930; that a statement made in May, 1931, failed to reveal the existence of the note payable to the bank; and that the statements furnished to the trustee in January, 1930,

and January, 1931, failed to show a loss on this transaction. It is, therefore, argued that it conclusively appears that the brothers intended to take the profit from this transaction personally, but changed their minds and turned it over to the corporation when the loss finally resulted. While certain irregularities appear and some of them may even be said to look suspicious, the entire question was one of fact for the court. In view of the documentary evidence and the records kept it would seem impossible that any of the brothers could have ever established a claim to this stock personally. At least two of the brothers purchased other Union Oil stock about the same time, on which they took their loss, and the brothers all testified that the transaction here in question was an estate company purchase and was at all times so considered and handled. In spite of any possible inferences to the contrary, which might be drawn from portions of the evidence, the evidence is sufficient to support the findings made.

About the same time two other purchases of Union Oil stock were made, one of 500 shares by the Bakersfield Laundry, which was wholly owned by the estate company, and one of 200 shares in the name of an old employee of the laundry. It is also contended that these were individual purchases by the brothers and shunted over to the estate company when a loss ensued. The 200 shares purchased in the name of the old employee were taken over by the laundry in 1929, before the crash occurred. It appears that the original intention was to reward a faithful employee but that the laundry took it over when the market started to go down. In spite of a number of irregularities in this connection it appears that this stock was paid for with laundry funds and that the laundry retained the stock and collected dividends thereon for years. Again, no more than a conflict in the evidence appears.

It is next contended that the court erred in charging Mrs. Cooper with $4,500 to be deducted from the amount found to be due her upon the distribution. Between 1929 and 1938 she had been paid this amount over and above the dividends paid to each of her brothers. This arose from the fact that L. P. St. Clair had guaranteed that her dividends would be at least $500 a month. She now contends that this was a personal agreement with this brother, that she was entitled to

consider all she received as dividends and that she is entitled to her full share on distribution regardless of this $4,500, and that if she has received any such other payment it is a matter to be adjusted (she apparently means litigated) between her and L. P. St. Clair personally. Not only is she not entitled to payment of the same amount twice but the contract between Mrs. Cooper and L. P. St. Clair provided that during any month when the dividends exceeded $500 she should "cause the excess thereof to be paid" to L. P. St. Clair until such advances had been repaid. The court followed the intent of the contract and no reason appears for prolonging the litigation between these parties merely on the ground that a different form of bookkeeping should have been used.

It would serve no useful purpose to comment in detail on the remaining findings which are objected to. One relates to an item which arose in 1920 and which was fully settled by the 1929 agreement; one relates to a purchase of shares in another corporation by E. S. St. Clair in 1931 in which the court found, on sufficient evidence, that it was his individual purchase; and the others relate to matters in which nothing appears but a conflict in the evidence with the exception of two matters where error was conceded and correction was or is to be made by consent of the respondents. In the latter connection, an amended account was filed at or near the conclusion of the trial in which E. S. St. Clair was charged with certain items amounting to $6,681.81 arising from matters which arose prior to 1929. Some question arose as to these matters and E. S. St. Clair consented that he be charged with them. It is now argued that because this concession was made the whole matter of accounting between 1915 and 1929 was opened up. Nothing appears in the record to sustain this contention and it is without merit. Complaint is made that in certain instances uncertainty and conflict appears in the findings and in others that no findings at all were made. The alleged uncertainty and conflict arises from the fact that the findings referred in general terms to certain paragraphs of what may be called the pleadings, but on investigation and analysis any uncertainty and any apparent conflict disappears. In the cases where no findings were made none were necessary because of the court's holding that all matters prior to 1929 were barred. All necessary findings were made and we

are unable to discover any finding which is not sufficiently supported by the evidence.

The appellant further contends that the respondents breached the 1929 agreement by purchasing the shares of Union Oil stock later in 1929 and by making one or two other investments. In effect, it is argued that under that agreement the directors of the corporation had no right to continue business or to incur debts but were obligated to use all monies received for the purpose of increasing dividends and distributing the same to the stockholders. The court found that no such violation of the contract occurred and the evidence supports that finding. The 1929 contract contains no provisions prohibiting the brothers, in conducting the affairs of the corporation, from borrowing money or making investments or from continuing to do business in the manner which had been followed for many years. While the agreement provided that the "surplus profits," and that part of the proceeds of the sale of any assets which represented "capital" as distinguished from "profit," should be distributed, there was no provision restricting the use of other funds or forbidding a continuance of any business transactions. Moreover, as to what part of the funds used in these investments came from capital and not from profit we are not advised. While some of the evidence is somewhat suggestive of a violation of this part of the agreement, the most that can be said is that there is a conflict both with respect to the evidence and the reasonable inferences therefrom. And it may be inferred that Mrs. Cooper knew of these transactions as early as 1934. Her testimony is that she knew about them in 1934 or 1935, that she was not sure of the exact date because "I didn't draw a ring around it," and that she then protested that this was a violation of the 1929 agreement.

The court found that all matters involved herein, with the exception of the $4,500 item above mentioned, are barred by the statute of limitations and by laches. We think these findings are supported by the evidence. Although she now contends that she reposed great confidence in her brothers and was lulled by them into a sense of security through these more than thirty years, the record quite clearly indicates the contrary. She employed attorneys to investigate the conduct of the affairs of the company as early as 1910 and many times thereafter. She had a rather full knowledge of the way these

affairs were conducted up to 1913 and not only has had considerable knowledge since that time but at frequent intervals through all these years she has started investigations, made complaints and has repeatedly, both orally and in writing, charged her brothers with dishonesty, with concealing and misrepresenting the facts in connection with the corporation, with mishandling its affairs, with taking the assets of the corporation and using them for their own purposes, and with cheating her in various ways. In many letters, running from 1923 down to shortly before these proceedings began, she not only repeatedly made these charges but expressly said that she could not believe her brothers and that she had no confidence in them. As the trial judge observed in his order for judgment: "Coming to this phase of confidence, the record amply supports the compellable conclusion that from a period beginning around 1910 the objector had confidence in nobody. Her first expressions show lack of confidence not only in the petitioners but likewise in other members of her family. She was constantly, from 1910, consulting attorneys, bankers and businessmen, carrying to them a story of the brothers' thievery, dishonesty and mishandling of the affairs of the family. She has continuously questioned the honesty and integrity of all counsel who had ever advised her, and while it is possible that some counsel of high repute may from time to time display the wolf under lamb's clothing it isn't likely that the seven or eight or even ten counsel contacted by her through the years would all betray her. Likewise at the time when some phases of litigation were carried on in the courts of Los Angeles County she has no hesitation in announcing the corruption of the courts. Further, her reference to the settlement of 1929 wherein she still maintains that it was her theory to go ahead and make a settlement with the petitioners solely for the purpose of setting it aside after she had gained the fruits of that settlement. Considering all of these things and drawing the only permissible inferences therefrom, it would seem absurd to make a finding that she was always one who had the utmost confidence and faith in the integrity of those handling the affairs of the corporation. Whatever presumptions otherwise may be indulged in on this point would certainly receive a severe jolt from the broadcast letters reflecting on the integrity of all concerned."

There can be no question that the appellant had ample means of knowledge of the things of which she now complains *(Consolidated R. & P. Co.* v. *Scarborough,* 216 Cal. 698 [16 P.2d 268],) and the court's findings in this regard are amply supported by the evidence. Some argument is presented as to whether the three-year statute or the four-year statute of limitation applies. Since it so clearly appears that all material matters, with a slight exception, are barred in either case, as well as by laches, it is unnecessary to go into this matter further. As the trial judge further said: ''There is not a word of testimony which would convince or remotely persuade that the equitable features which excuse laches and delay are present. And further, taking the case itself in all of its ramifications, if there ever was a case presented where the rule of laches should be enforced it is a case of this sort. The record itself discloses how difficult and almost impossible it is to run down the hundreds of transactions covering this period of years and reach any maintainable conclusion. Indeed, as counsel for the objector stated during the argument, 'the main trouble in this case is that almost every fact points four or five different ways.' ''

It is contended that the court erred in not admitting in evidence the reports of an accountant who had been appointed by the court to examine the books and records of the corporation for the period from January 31, 1929, to January 31, 1938, and later ordered to report on the entire period of time from 1903 to 1938. He filed partial reports, stating that he was unable to get much of the information he desired. His reports contained not only accounts and summaries of various items but also opinions and conclusions on matters which were for the court to decide. Objections to their receipt in evidence in toto were sustained but the figures, accounts and computations contained therein, or practically all of them, were admitted by stipulation. This accountant was himself a witness and testified at great length. Any material matters to which he could testify were either covered or could well have been. We find no reversible error in this connection.

The last point raised is that the court erred in refusing an allowance of costs and attorney's fees to the appellant. This part of the proceeding was for the benefit of the appellant and the only benefit which appears to have accrued to

the corporation is a reduction of the claim of one of the brothers against the corporation in the amount of $6,681.81. Whether this error would have been discovered or corrected in any event we cannot know. Attorney's fees were allowed to neither side and the entire matter was one resting in the sound discretion of the trial court. If there was any abuse of that discretion it has not been brought to our attention.

This appeal has been ably presented by counsel on both sides. It has seemed to us neither necessary nor advisable to prolong this opinion by considering in detail all of the suggestions and arguments made, or by reviewing the entire evidence in connection with each of the many points directly and incidentally made. Some of the bitterness that has grown with the years has crept into the briefs, and many of the charges here made are based upon suspicion, conclusions and disputable inferences. Without completely reviewing all of these matters, we have attempted to present the general picture and to briefly consider and pass upon the controlling issues.

The situation has been unfortunate, and the entire blame cannot be placed on either side. While the brothers, in conducting the affairs of the corporation, have done things that should not have been done, the record also discloses that they have had much to contend with, and all of the so-called "equities" are not in favor of the sister. The appellants claim the corporation had $550,000 in assets at the time of the 1929 agreement. Since then the dividends amount to some $360,000. According to the account filed and approved about $400,000 still remains to be distributed. In view of the well-known losses sustained by many corporations during the years following the 1929 crash, this showing is hardly conclusive of inefficient or dishonest management. Moreover, Mrs. Cooper received large sums prior to the 1915 agreement, and received $65,000, as well as a house to live in, between then and 1929, even though she may not have been legally entitled to all of it.

The trial court was faced with a complex factual situation where many things had been done which could not be undone, where other things could not be changed without working an injustice, and where, in fairness to all parties, practical considerations could not be ignored. Its findings and conclusions are not only supported by the evidence but the record indi-

cates that they are in accord with justice. This long continued' controversy should be ended, and the voluntary dissolution of the corporation concluded as speedily as possible.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied December 19, 1944, and appellants' petition for a hearing by the Supreme Court was denied January 18, 1945.